# Constitutionality of the D.C. House
# Voting Rights Act of 2009

The constitutionality of the District of Columbia House Voting Rights Act of 2009 presents a close question, but the balance tips in favor of finding the Act constitutional.

Neither the text of the Constitution nor the analysis of applicable precedent clearly resolves the question of whether Congress may confer House voting rights on D.C. residents by legislation.

In the absence of a clear constitutional prohibition, the Constitution does not require denying the most basic rights in a democracy—the right to elect representation in the legislature and therefore to self-governance—to U.S. citizens who happen to be residents of the District of Columbia.

February 26, 2009

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT[*]

You have requested the view of the Department of Justice regarding the constitutionality of H.R. 157 and S. 160, which propose legislation granting congressional representation to the District of Columbia (collectively, the "D.C. House Voting Rights Act"). Although it presents a close constitutional question, in my view, for the reasons explained below, the balance tips in favor of finding this proposed legislation constitutional.

## I. Executive Summary

H.R. 157 and S.160 would give the District of Columbia one voting member in the House of Representatives. Each bill includes a provision stating: "Notwithstanding any other provision of law, the District of Columbia shall be considered a Congressional district for purposes of representation in the House of Representatives." H.R. 157, § 2(a); S. 160, § 2(a). Each bill would grant the citizens of the District the ability to elect a voting member of the House of Representatives by identifying it as a congressional district in its own right, although neither bill purports to grant the District statehood.

---

* Editor's Note: This opinion refers to views of the Office of Legal Counsel on the same legislation, which are available elsewhere in this volume. *See Views on Legislation Making the District of Columbia a Congressional District*, 33 Op. O.L.C. 156 (2009).

There are a number of strong arguments against the constitutionality of such a statute, including those advanced by the Office of Legal Counsel with respect to prior versions of the proposed legislation. *See Constitutionality of the D.C. Voting Rights Act of 2007*, 31 Op. O.L.C. 147 (2007) ("*D.C. Voting Rights Act*") (statement of John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel); E-mail for Velma Taylor, Office of Legislative Affairs, from Michelle Boardman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 5388, the District of Columbia Fair and Equal House Voting Rights Act of 2006* (May 22, 2006). The Office of Legal Counsel has recently presented to me its view that the current proposed legislation is similarly infirm. These arguments rest primarily on the text of Article I, Section 2 of the Constitution (the "Composition Clause"), which provides: "The House of Representatives shall be composed of Members chosen every second Year *by the People of the several States*, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1 (emphasis added).

At the same time, there are a number of compelling arguments in favor of the constitutionality of the proposed legislation, including those advanced by a diverse array of well-respected constitutional scholars. *See, e.g.*, Viet D. Dinh & Adam H. Charnes, *The Authority of Congress to Enact Legislation to Provide the District of Columbia with Voting Representation in the House of Representatives* at 19 (Nov. 2004), https://www.dcvote.org/sites/default/files/upload/vietdinh112004.pdf ("Dinh & Charnes"); *Common Sense Justice for the Nation's Capital: An Examination of Proposals to Give D.C. Residents Direct Representation: Hearing Before the H. Comm. on Gov't Reform*, 108th Cong. 77–84 (June 23, 2004) (Serial No. 108-218) (statement of Kenneth W. Starr); *Ending Taxation Without Representation: The Constitutionality of S. 1257: Hearing Before the S. Comm. on the Judiciary*, 110th Cong. 18–22 (May 23, 2007) (S. Hrg. No. 110-440; Serial No. J-110-38) (statement of Patricia Wald) ("Wald Statement"); *see also* Peter Raven-Hansen, *Congressional Representation for the District of Columbia: A Constitutional Analysis*, 12 Harv. J. on Legis. 167, 191 (1975). These scholars rely upon Congress's plenary power to legislate for the District of Columbia under Article I, Section 8, Clause 17 (the "District Clause"), together with case law holding that, under the authority conferred by the District Clause, Congress

may provide that the District should be treated as a state for constitutional purposes. In addition, proponents of the legislation contend that fundamental principles of democracy and the importance of the right to vote—principles that animate the Constitution and undergird our founding as a nation—further buttress their constitutional analysis.

These competing arguments highlight the fact that the constitutionality of the D.C. House Voting Rights Act presents a close constitutional question. Neither the text of the Constitution nor the analysis of applicable precedent clearly resolves the question of whether Congress may confer House voting rights on D.C. residents by legislation. In addition, should Congress enact the proposed legislation, that act would embody the will of the people of the United States to extend the franchise to District citizens. In that context, and in the absence of a clear constitutional prohibition, I cannot conclude that the Constitution requires us to ignore the will of the American people and to deny the most basic rights in a democracy—the right to elect representation in the legislature and therefore to self-governance—to U.S. citizens who happen to be residents of our nation's capital, the District of Columbia.[1]

## II. The D.C. House Voting Rights Act of 2009 Is Constitutional

### A. The District Clause Empowers Congress to Provide Congressional Representation to Residents of the District of Columbia

The District Clause confers on Congress the power to "exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17. In my view, the power conferred by the District Clause includes the authority to create a congressional district within the District of Columbia.

---

[1] The closeness of the constitutional question precludes confident prediction regarding the outcome of any litigation regarding the constitutionality of the proposed legislation. Consequently, decision-makers should be mindful of the substantial litigation risks associated with the possibility of judicial review of a congressional decision to extend voting rights of the District of Columbia by ordinary legislation, should the courts find an appropriate vehicle to conduct such a review.

The Supreme Court has held that Congress's power under the District Clause is plenary, providing Congress with "full and unlimited jurisdiction to provide for the general welfare of District citizens by any and every act of legislation which it may deem conducive to that end." *Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.*, 337 U.S. 582, 601 (1949) (quoting *Neild v. Dist. of Columbia*, 100 F.2d 246, 250 (D.C. Cir. 1940)). Moreover, when Congress exercises its power to legislate for the District, it "acts as a legislature of national character, exercising complete legislative control as contrasted with the limited power of a state legislature, on the one hand, and as contrasted with the limited sovereignty which Congress exercises within the boundaries of the states, on the other." *Id*. at 602; *see also Palmore v. United States*, 411 U.S. 389, 397–398 (1973); *United States v. Cohen*, 733 F.2d 128, 140 (D.C. Cir. 1984) (Scalia, J.) (noting that Congress has "extraordinary plenary power" in legislating for the District).

The Supreme Court has upheld Congress's authority to enact legislation that treats the District of Columbia as a "state" for constitutional purposes, even where the text of the Constitution, by referring to "states," would appear to preclude such legislation. In *Tidewater Transfer*, a three-Justice plurality upheld Congress's power to confer jurisdiction on federal courts over state-law suits between citizens of the District and citizens of other States. 337 U.S. at 603–04. The plurality did so even though the text of Article III purported to limit such jurisdiction only to suits "between citizens of different states." U.S. Const. art. III, § 2, cl. 1. The plurality acknowledged Chief Justice Marshall's conclusion in *Hepburn & Dundas v. Ellzey*, 6 U.S. (2 Cranch) 445 (1805), that "the District of Columbia is not a state within Article III of the Constitution," *Tidewater Transfer*, 337 U.S. at 588, as well as the concomitant conclusion that a state-law suit between a District resident and a citizen of a state would not be diverse within the meaning of Article Ill's explicit language, *id*. at 600. The plurality noted, however, that *Hepburn & Dundas* had not considered the exact question before it, whether Congress could exercise its authority under the District Clause to create diversity jurisdiction under Article III for suits involving residents of the District. The plurality also noted that the Court's opinion in *Hepburn & Dundas* suggested that Congress could create a "legislative" solution:

> It is therefore significant that . . . the Chief Justice added, as we have seen, that it was extraordinary that the federal courts should be closed to the citizens of "that particular district which is subject to the jurisdiction of congress." Such language clearly refers to Congress' Art. I power of "exclusive Legislation in all Cases whatsoever, over such District." And mention of that power seems particularly significant in the context of Marshall's further statement that the matter is a subject for "legislative not for judicial consideration." [*Hepburn & Dundas*, 6 U.S. at 453.] Even if it be considered speculation to say that this was an expression by the Chief Justice that Congress had the requisite power under Art. I, it would be in the teeth of his language to say that it is a denial of such power.

*Tidewater Transfer*, 337 U.S. at 589. The plurality concluded that "[t]o put federally administered justice within the reach of District citizens . . . is an object which Congress has a right to accomplish," and Congress's determination that it had the authority to use Article I to confer jurisdiction of the district courts was entitled to deference. *Id*. at 603, 607.[2]

Two other cases have upheld Congress's power to enact legislation that treated the District of Columbia as though it were a state for purposes of a constitutional provision.[3] In *Milton S. Kronheim Co. v. District of Columbia*, 91 F.3d 193 (D.C. Cir. 1996), the Court of Appeals for the District of Columbia upheld Congress's treatment of D.C. as a state for purposes of the Twenty-First Amendment, which provided that "[t]he transportation or importation into any state, territory, or possession of

---

[2] Two Justices concurred in the judgment, but would have overruled *Hepburn & Dundas* and held that D.C. was a state under Article III. They disagreed with the plurality's holding that the District Clause provided Congress the necessary authority to supplement the jurisdiction conferred by Article III. *Tidewater Transfer*, 337 U.S. at 621–26. Although no rationale commanded a majority of the Court, a majority concluded that the District of Columbia could be treated as a state for purposes of a constitutional provision that was seemingly limited to "states."

[3] Although they do not analyze Congress's power under the District Clause, several opinions of the Supreme Court have held that the District of Columbia is a state for purposes of some constitutional provisions. *See, e.g.*, *Stoutenburgh v. Hennick*, 129 U.S. 141 (1889) (holding that the District of Columbia was a state within the meaning of the Commerce Clause); *Callan v. Wilson*, 127 U.S. 540 (1888) (stating that the Sixth Amendment right to "impartial jury in the state and [judicial] district" of the crime applies to D.C.).

the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2. The court was considering a D.C. statute that regulated the storage of liquor in the District, and that arguably would have violated the dormant Commerce Clause if the Twenty-First Amendment were held not to apply to D.C. The court upheld the statute and stated that "we will treat the District of Columbia as a state for purposes of the Twenty-First Amendment analysis. Congress determined at the time of the passage of the ABC Act . . . that the District would function in a state-like manner for alcohol regulation purposes. We have no warrant to interfere with Congress's plenary power under [the District Clause]." *Kronheim*, 91 F.3d at 201. Similarly, in *Clarke v. Washington Metropolitan Area Transit Authority*, 654 F. Supp. 712, 714 n.1 (D.D.C. 1985), *aff'd*, 808 F.2d 137 (D.C. Cir. 1987), the District Court for the District of Columbia upheld Congress's power to enact legislation that treated the District as a state for purposes of Eleventh Amendment immunity, despite that amendment's textual application only to each "one of the United States."

In response to these arguments, opponents of the constitutionality of the D.C. House Voting Rights Act have pointed out that Congress may exercise its District Clause power only in accordance with other provisions of the Constitution. But *Tidewater Transfer* and the other cases support the argument that Congress has some leeway, pursuant to the District Clause, to prescribe the manner in which the District will be treated for purposes of various constitutional provisions. Presumably, that discretion is limited by the rest of the Constitution, in the sense that Congress may not treat the District as a state if doing so would violate the fundamental principles expressed in the Constitution (as opposed to the literal text that limits a provision to "states"). *See Tidewater Transfer*, 337 U.S. at 585. As discussed below, there are persuasive arguments that granting House voting rights does not offend the structural principles animating Article I.

## B. Important Constitutional Principles Reinforce Congress's Power Under the District Clause

Congress's power to treat the District as though it were a state for purposes of representation in the House of Representatives is consistent with two vitally important constitutional principles: that the Constitution

protects the right to be represented in the federal government, and that this right belongs to the people, rather than the states. A narrow reading of Congress's authority under the District Clause would contravene the very structural and political principles that Article I's voting provisions were designed to protect.

First, there is no question that the right to vote for representation in the House of Representatives is fundamentally important. Any consideration of Congress's Article I power must take place against the backdrop of the principles of self-government that illuminated the framing of the Constitution. *See Powell v. McCormack*, 395 U.S. 486, 547 (1969) (interpreting Article I in light of principle of self-representation). Congressional action to grant D.C. voting rights would vindicate these principles by expanding the franchise. The right to participate in government directly—to petition it, alter it, or abolish it—was thought of by many framers as an inalienable right that could not be vitiated by governmental action, even on the constitutional level. Under this theory, while the Constitution may not have explicitly commanded that District residents receive the vote, it may not be interpreted in a manner that invalidates an expansion of the franchise that a majority of the people, as represented by a majority of the House and Senate, wish to grant.

Second, extending the vote to District residents would vindicate—rather than undermine—the structural principles expressed in Article I. While the Senate was designed to provide representation to the states, the House was designed to represent the people directly. *See, e.g.*, Sen. Orrin G. Hatch. *"No Right is More Precious in a Free Country": Allowing Americans in the District of Columbia to Participate in National Self-Government*, 45 Harv. J. on Legis. 287, 304 (2008); U.S. Const. art. I, § 2, c1. 1 (House members to be chosen by "the people of the several states"). The Framers intentionally vested this right in the people, so that its enjoyment would not depend on state citizenship or state regulation. *See U.S. Term Limits v. Thornton*, 514 U.S. 779, 844 (1995) (Kennedy, J., concurring) ("The federal right to vote . . . does not derive from the state power in the first instance but . . . belong[s] to the voter in his or her capacity as a citizen of the United States"); *id*. at 845 (the right arises out of the "relationship between the people of the Nation and their National Government, with which the States may not interfere"); *id*. at 805 (Stevens, J., for the Court) (noting that "'while, in a loose sense, the right to

vote for representatives in Congress is sometimes spoken of as a right derived from the states,'" in fact it "was a new right, arising from the Constitution itself" (quoting *United States v. Classic*, 313 U.S. 299, 315 (1941)). Given that the right to House representation actually resides in the people themselves, it would over-read the language of the Composition Clause to hold that it explicitly precludes a congressional exercise of Congress's power under the District Clause to grant House voting rights to the District's residents.

Relatedly, expanding access to the vote in this manner would not interfere with any other core principles underlying the structure established in Article I. Providing the District with a House vote would not dilute any other citizens' right to vote (at least, it certainly would not dilute anyone's representation to any greater extent than any other exercise of Congress's authority to increase the number of representatives "in such Manner as they shall by law direct," U.S. Const. art. I, § 2, cl. 3). *See* Wald Statement at 10. Nor would providing voting rights threaten to aggrandize the national government. As the Court has noted, one of the predominant concerns surrounding the establishment of Congress's power to govern itself was the fear that elected officials would use that power at the expense of the people or the states. *See Powell*, 395 U.S. at 533–34. As a result the framers were particularly concerned with Congress's ability to limit the number or type of people who could become representatives. *See* 2 *Records of the Federal Convention of 1787* 249–50 (M. Farrand ed., 1911) ("A Republic may be converted into an aristocracy or oligarchy as well by limiting the number capable of being elected, as the number authorized to elect." (Madison)); *Powell*, 395 U.S. at 548 (in light of "fundamental principle of our representative democracy . . . that the people should choose whom they please to govern them," holding that Congress could not supplement the Constitution's list of qualifications for office (internal citations omitted)), Here, granting the residents of the District the right to elect a single representative would not run this risk or contravene the rule against aggrandizement. Congress would be expanding, rather than limiting, the ability of the people to elect the officials of their choice.

## C. No Other Controlling Authority Resolves the Question

### 1. Selected Cases Holding That the District Is Not a State for Unrelated Purposes Do Not Apply Here

Although the federal courts have ruled that the District of Columbia is not a "state" under specific provisions of the Constitution, it does not follow that the proposed legislation is necessarily unconstitutional. This is because the question with respect to the D.C. House Voting Rights Act is not whether the District is a "state," but whether Congress has authority under the District Clause to enact legislation that treats the District as a state for purposes of voting representation in the House. For example, in *Hephurn & Dundas*, Chief Justice Marshall held that a statute conferring diversity jurisdiction on the federal courts did not apply to suits between citizens of D.C. and citizens of a state. Reasoning that other constitutional provisions used the word "state" to refer only to states, the Court concluded that Congress did not intend the statute, which was modeled on the language of Article III, to create federal jurisdiction over suits involving District residents. Put simply, the question of Congress's power under the District Clause to pass legislation that treated the District of Columbia as a congressional district was not before the Court.

Likewise, and more recently, in *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000), a three-judge panel of the D.C. District Court applied *Hephurn & Dundas* to hold that the District was not a state under the Composition Clause, and therefore that the Constitution itself did not confer voting rights on D.C. residents. The court concluded that because "the Constitution does not contemplate that the District may serve as a state for purposes of the apportionment of congressional representatives," *id*. at 50, "the clauses of Article I that provide for congressional voting . . . are not applicable to residents of the District of Columbia," *id*. at 60. The Supreme Court summarily affirmed the decision. 531 U.S. 941. Like *Hephurn & Dundas*, Adams does not prohibit Congress from granting voting rights by legislation, because it addressed a question that is not raised here, namely, whether Article I itself directly provided District residents with a constitutionally compelled right to vote. 90 F. Supp. 2d at 38. Indeed, the court distinguished its case from *Tidewater Transfer* because, in *Tidewater Transfer*, Congress had affirmatively exercised its

legislative authority to supplement Article III and therefore the plurality had not held that the Constitution itself established the District as a state for purposes of Article III. *Adams*, 90 F. Supp. 2d at 54–55.[4]

### 2. Passage of the Twenty-Third Amendment Does Not Bear on Congress's Power to Grant Congressional Voting Rights to District Residents by Legislation

Another potential argument against the constitutionality of the D.C. House Voting Rights Act rests on the fact that D.C. residents were granted the right to vote in presidential elections by means of the Twenty-Third Amendment. Some have taken Congress's prior use of a constitutional amendment to expand voting rights within the District to reflect the need to use an amendment to work any type of expansion of D.C.'s voting rights.

Congress's choice to use an amendment to establish voting rights for presidential elections does not imply that a constitutional amendment is the only means by which voting rights may be granted, however. The Twenty-Third Amendment was designed to address a wholly different constitutional issue, voting for President under Article II, an issue over which Congress had limited authority. *See Oregon v. Mitchell*, 400 U.S. 112 (1970) (holding that Congress may regulate presidential elections through Section 5 of the Fourteenth Amendment, but not through its Article I powers). Because the Fourteenth Amendment did not apply to the District, Congress was forced to use a constitutional amendment, rather than legislation, to provide the District's residents with the right to vote in presidential elections. *See* Dinh & Charnes at 21. This problem would not be present with respect to the proposed legislation, given that Congress has power to regulate House elections under Article I and the District Clause.

---

[4] Other cases that refer to the right of District residents to vote for congressional representation, *see, e.g.*, *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994) (holding that House rules cannot confer a voting representative to District residents); *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005) (holding that, pursuant to the District Clause, Congress can prohibit the imposition of a commuter tax), can similarly be distinguished.

## D. The United States Has Expanded Voting Rights
## by Statute in Other Circumstances

A statutory precedent also supports the conclusion that the D.C. House Voting Rights Act is constitutional. The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C. § 1973ff *et seq.*, "extends federal voting rights to U.S. citizens formerly citizens of a State who reside outside the United States." *Romeu v. Cohen*, 235 F.3d 118, 120 (2d Cir. 2001). UOCAVA applies even to voters who have no plans to return to their former states, do not pay taxes in their former states, and have no residence in their former states. Although the statute permits these voters to vote absentee in their former states, rather than allowing them to vote as part of a non-state entity, the fact remains that these voters would be disenfranchised under a narrow reading of Article I.

Under a literalist reading, because they are no longer citizens of a state, they would not have "the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1; *see* Dinh & Charnes at 18.

## III. Arguments Against the Constitutionality of
## the D.C. House Voting Rights Act of 2009

The Office of Legal Counsel ("OLC") recently submitted to the Office of Management & Budget its conclusion that the D.C. House Voting Rights Act of 2009 is unconstitutional, and has provided me with a thorough explanation of the basis for its constitutional conclusion. In reaching this conclusion, the Office of Legal Counsel remained consistent with two recent, prior opinions offered by the Office. *See D.C. Voting Rights Act*, 31 Op. O.L.C. at 147 ("S. 1257 violates the Constitution's provisions governing the composition and election of the United States Congress."); E-mail for Velma Taylor, Office of Legislative Affairs, from Michelle Boardman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: HR. 5388, the District of Columbia Fair and Equal House Voting Rights Act of 2006* (May 22, 2006) ("We conclude that the creation of a District of Columbia seat by this legislation is unconstitutional. Membership in the House of Representatives is limited to representatives elected

by the people of the several States, and the District of Columbia is not a State.").[5] The Office of Legal Counsel rests its argument on the constitutional text of the Composition Clause, as well as related historical evidence and judicial authority, and disputes the argument that the District Clause affords Congress sufficient authority to extend congressional voting rights to the District of Columbia by ordinary legislation.

Although I have reached the conclusion that the balance of arguments tips slightly in favor of the constitutionality of the D.C. House Voting Rights Act, I remain mindful of the substantial constitutional arguments that have been advanced against the proposed legislation, including those offered by the Office of Legal Counsel. Consequently, while, for the reasons explained above, it is my view that the fundamental importance of the right to representation in our constitutional scheme tips the scales in favor of the proposed legislation in this exceptional case, I believe it is important that any decision-maker be aware of the weighty constitutional arguments on the other side. This is particularly so given the substantial litigation risks that this constitutional uncertainty creates. Accordingly, I will provide a brief summary of the views that have been advanced against the constitutionality of the statute, including the principal arguments advanced by the Office of Legal Counsel.[6]

---

[5] Although Congress had not sought to give the District voting representation by ordinary legislation until recently, OLC also points to its analysis of related questions as further support for OLC's longstanding view. *See, e.g.*, Letter for Benjamin Zelenko, Committee on the Judiciary, House of Representatives, from Martin F. Richman, Acting Assistant Attorney General, Office of Legal Counsel (Aug. 11, 1967) (explaining that "provisions for elections of Senators and Representatives in the Constitution are stated in terms of the States, and the District of Columbia is not a State"); Memorandum for Warren Christopher, Deputy Attorney General, from Frank M. Wozencraft, Assistant Attorney General, Office of Legal Counsel, *Re: Budget, Economic, and State of the Union Messages* (Oct. 16. 1968) (same); *District of Columbia Representation in Congress: Hearing on S.J. Res. 65 Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 95th Cong. 16–29 (1978) (testimony of John M. Harmon, Assistant Attorney General, Office of Legal Counsel) (stating that, "[i]f the District is not to be a state, then an amendment [to the Constitution] is required" to give the District voting representation in Congress, as "we do not believe that the word 'state' as used in Article I can fairly be construed to include the District under any theory of 'nominal statehood'").

[6] OLC prepared a thorough written analysis delineating its views regarding the constitutionality of the proposed legislation. My summary of the arguments that have been advanced against the constitutionality of the legislation here does not purport to be a full

Those who argue against the constitutionality of the legislation primarily advance the following arguments:

## A. The Text of the Composition Clause Is Clear

To proponents of the view that the legislation is unconstitutional, including OLC, the key constitutional provision is the Composition Clause, which governs the membership of the House of Representatives. The Clause provides: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. From their perspective, the language itself clearly limits the right to choose "members" of the House to people from states, and that nothing in the text of the Composition Clause indicates that the people of an entity other than a state may do so. Supporters of this view urge that the reference to "the people" in the Clause is best read to underscore that members of the House would be selected by popular vote within "the several states" whereas members of the Senate would be selected (prior to the adoption of the 17th Amendment) by state legislatures. It is this critical distinction that underlies the familiar description of the House of Representatives as "the people's house."[7]

---

catalogue of the issues raised in OLC's analysis, but rather reflects what I understand to be key points raised by those who argue against the constitutionality of the statute. I am happy to provide OLC's full written analysis in the event that you or other decision-makers are interested.

[7] This line of reasoning is underscored by other provisions of the Composition Clause. Immediately after providing that members of the House shall be chosen by "the people of the several States," the Clause directs that the electors in House elections "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. (emphasis added). "[F]or most of its history," however, "the District of Columbia has had nothing that could even roughly be characterized as a legislature for the entire District." *Adams*, 90 F. Supp. 3d at 47; *see also id.* at 49 ("The impossibility of treating Congress as the legislature under that clause is manifest, as doing so would mean that Congress would itself choose the District's senators."). Likewise, the same section of Article I provides: "When vacancies happen in the representation from any State, the executive authority thereof shall issue writs of election to fill such vacancies." As the *Adams* court explained, this provision would be anomalous as applied to the District. Leaving aside the fact that the Mayor of the District is a relatively recent office,

## B. Historical Evidence and More Recent Practice
## Support This View

This conclusion is reinforced by pointing to evidence that the Framers regarded states as uniquely important components of the federal constitutional structure. *See Adams*, 90 F. Supp. at 56 ("The Constitution's repeated references to states . . . are reflections of the Great Compromise forged to ensure the Constitution's ratification. There is simply no evidence that the Framers intended that not only citizens of states, but unspecified others as well, would share in the congressional franchise."). Likewise, those who find the legislation unconstitutional contend that the evidence from founding-era history supports the conclusion that Congress may not give the District voting representation in the House without making the District a state. *See generally Adams*, 90 F. Supp. 2d at 50–53. The District was created to serve the distinct purpose of protecting the national government and its institutions. That particular purpose—maintaining the nation's capital as a non-state entity—obviously does not require that the District be denied voting representation in Congress. *See, e.g.*, Raven-Hansen, *Congressional Representation for the District of Columbia*, 12 Harv. J. on Legis. at 184. But opponents of the proposed legislation, including OLC, contend that Founding-era statements addressing the voting rights of residents of such a district—including statements

---

"it is Congress that is the ultimate executive authority for the District." *Id*. at 49. And "[t]he possibility that the Framers intended Congress to fill its own vacancies seems far too much of a stretch, even if the constitutional fabric were more flexible than it appears to be." *Id*.; *see also* U.S. Const. art. I, § 2, cl. 2 ("No person shall be a Representative . . . who shall not, when elected, be an inhabitant of that *State* in which he shall be chosen.") (emphasis added). The repeated textual references to "states" or "state" in this Clause, when combined with the numerous constitutional provisions relating to federal elections that similarly restrict voting to "states" and their people, are presented as a clear intention to exclude non-state entities, such as the District, unless the Constitution expressly provides otherwise. *See* U.S. Const. amend. XXIII, § 1 (The District "shall appoint . . . [a] number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State, but in no event more than the least populous State; they shall be *in addition to those appointed by the States*, but they shall be considered, *for the purposes of the election of President and Vice President*, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment." (emphasis added)).

from prospective district residents themselves—clearly reveal an under-standing that citizens of the District would have no right to vote in national elections, as they were not residents of a state.[8]

Likewise, proponents argue that subsequent historical practice and the resultant constitutional structure further confirm this view. For instance, some suggest that the ratification of the Twenty-Third Amendment, ratified in 1961—which provides that the District "shall appoint . . . [a] number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State, but in no event more than the least populous State; they shall be *in addition to those appointed by the States*, but they shall be considered, *for the purposes of the election of President and Vice President*, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment" (emphasis added)—provides further support for this view, as this text would serve no purpose if the District were already

---

[8] *See, e.g.*, 10 Annals of Cong. 991, 998–99 (1801) (remarks of Rep. Dennis) (stating that because of District residents' "contiguity to, and residence among the members of [Congress]," "though they might not be represented in the national body, their voice would be heard. But if it should be necessary [that they be represented], the Constitution might be so altered as to give them a delegate to the General Legislature when their numbers should become sufficient"); *id.* at 992 (remarks of Rep. Bird) (assigning "blame" for disenfranchisement of District residents to "the men who framed the Constitutional provision, who peculiarly set apart this as a District under the national safeguard and Government"); 5 *The Papers of Alexander Hamilton* 189–90 (Harold C. Syrett ed., 1962) (reprinting text of subsequently rejected amendment proposed by Alexander Hamilton during the New York ratifying convention: "That When the Number of Persons in the District of Territory to be laid out for the Seat of the Government of the United States, shall according to the Rule for the Apportionment of Representatives and Direct Taxes Amount to [left blank] such District shall cease to be parcel of the State granting the Same, *and Provision shall be made by Congress for their having a District Representation in that Body*." (emphasis added)); *see also* 12 Annals of Cong. 487 (1803) (remarks of Rep. Smilie) ("Under the exercise of exclusive jurisdiction the citizens are deprived of all political rights, nor can we confer them."); 5 *The Documentary History of the Ratification of the Constitution* 621 (Merrill Jensen, John P. Kaminski & Gaspare J. Saladino eds., 1976) (statement by Samuel Osgood, a delegate to the Massachusetts ratifying convention, that he could accept the Seat of Government provision only if it were amended to provide that the District be "represented in the lower House," though no such amendment was ultimately included in the amendments recommended by the Massachusetts convention); *see generally Adams*, 90 F. Supp. 2d at 51–53 (recounting this history).

a state for purposes of constitutional provisions governing federal elections. Even if this amendment is not conclusive regarding the meaning of Article I, some, including OLC, contend that fidelity to constitutional structure now requires factoring this amendment into the interpretation of Article I.

## C. Judicial Precedent Supports This View

Proponents of this view also argue that recent judicial authority affirms this same conclusion, and point to *Adams*, which relied on similar evidence from text, history, and precedent to conclude that the District of Columbia is not a "state" within the meaning of the Composition Clause. 90 F. Supp. 2d at 55–56 ("In sum, we conclude that constitutional text, history, and judicial precedent bar us from accepting plaintiffs' contention that the District of Columbia may be considered a state for purposes of congressional representation under Article I."). That decision was summarily affirmed by the Supreme Court. 531 U.S. 941 (2000); *see also Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) (summary affirmance is a precedential ruling on the merits).

## D. The District Clause Provides Only Limited Authority to Congress

This argument rejects the notion that the District Clause might provide support for the legislation, concluding that such direct reliance on Congress's authority under the District Clause to support District voting representation in the House is not persuasive. Its proponents acknowledge that the District Clause gives Congress broad power to provide for the governance of the District, but contend that what this means is simply that Congress has "all legislative powers that the legislature of a state might exercise within the state." *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899). As courts have stressed, Congress's broad power to provide for the governance of the District does not give it the authority to "contravene any provision of the Constitution." *Palmore v. United States*, 411 U.S. 389, 397 (1973) (quoting *Hof*, 174 U.S. at 5); *accord Keller v. Potomac Elec. Co.*, 261 U.S. 428, 443–44 (1923); *see also Neild v. Dist. of Columbia*, 110 F.2d 246, 249 (D.C. Cir. 1984) ("*Subject only to those prohibitions of the Constitution which act directly or by implication upon the*

*federal government*, Congress possesses full and unlimited jurisdiction to provide for the general welfare of citizens within the District of Columbia by any and every act of legislation which it may deem conducive to that end.") (emphasis added). Consequently, from this perspective, the District Clause does not afford Congress the opportunity to override the requirements of the Composition Clause, nor can the Composition Clause reasonably be read to permit Congress to treat the District as a "state" for purposes of representation in the House through legislation. Indeed, some argue that, if it could be so read, there would be no principled basis for concluding that Congress could not, by statute, give territories voting representation in the House as well.

### E. *Tidewater Transfer* Does Not Support a Contrary Conclusion

Those who argue that the proposed legislation is unconstitutional, including OLC, contest the reliance of proponents of the pending legislation on *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582 (1949). That case held that Congress may give Article III courts jurisdiction over suits brought by citizens of the District of Columbia against citizens of the several states, even though Article III expressly confers diversity jurisdiction only over cases involving residents of "states." However, opponents argue that the fractured decision in *Tidewater Transfer* is not persuasive authority for the proposition that Congress may enact legislation that treats the District of Columbia a "state" for purposes of the Composition Clause for at least two reasons. First, the holding that Congress could, through legislation, provide that the District should be treated as a state for purposes of Article III diversity jurisdiction was in a plurality opinion that had the support of only three justices and should not be given precedential effect. Second, even if the opinion were given some precedential effect, opponents argue that, unlike the decision to extend Article III diversity jurisdiction to cases involving the District, the decision to treat the District as a state for purposes of the Composition Clause would improperly disturb the balance between the Union and the several states struck in the Constitution, and would therefore exceed the limit Justice Jackson presented in *Tidewater Transfer*.

## F. Strong Policy Reasons for Extending Congressional Voting Rights Do Not Provide a Basis for Overriding Clear Constitutional Text

Some proponents of the view that this legislation is unconstitutional, including OLC, acknowledge the strong policy considerations that have been advanced in support of the extension of congressional voting rights to citizens of the District, noting that there is no denying the force of the considerations in favor of enfranchising District residents. *See, e.g.*, *Loughborough v. Blake*, 18 U.S. 317, 324 (1820) (conceding that "in theory it might be more congenial to the spirit of our institutions to admit a representative from the district," but omitting any suggestion that Congress might provide such representation by simple legislation); *Adams*, 90 F. Supp. 2d at 66 ("We do not disagree that defendants have failed to offer a compelling justification for denying District residents the right to vote in Congress."). As important as these constitutional purposes are, however, they nevertheless argue that the fact that the plain terms of the Composition Clause give the people of the states, and only those electors, the right to choose House members is not surprising or at odds with the central purposes of the founding charter. Likewise, some, including OLC, recognize the arguments that these policy considerations are implicit in the constitutional structure and that, in consequence, Congress should be assumed to have the authority to enact the pending legislation unless the Constitution *clearly* prohibits it. OLC's view, however, is that this proposed legislation would be unconstitutional even if such a clear statement rule were appropriate in this context.

\* \* \* \* \*

In sum, those who find the proposed legislation unconstitutional, including OLC, conclude that Congress may not by statute give the District of Columbia voting representation in the House. From this perspective, the relevant constitutional text, original understanding, historical practice, and judicial precedent all clearly support the proposition that the District is not a "state" within the meaning of the Composition Clause. Even acknowledging that the District Clause gives Congress broad power to legislate for the District, proponents of this view contend that the District

Clause does not permit Congress to override the prescriptions of the Composition Clause.

## III. Conclusion

I have concluded that, in this exceptional case, although the question is exceedingly close, my views are different than those offered by the Office of Legal Counsel. For the reasons outlined in Part II above, I believe that, for each of these constitutional points, there are sufficient rejoinders to, at a minimum, place the answer to the constitutional question in doubt. In my view, the arguments of those who find the proposed legislation unconstitutional, including OLC's analysis, identify no clearly controlling constitutional text or squarely on-point precedent. What is at stake in this legislation is whether the more than half-a-million residents of our Nation's capital, who pay taxes, serve in the Armed Forces, and sit on federal juries like other Americans, have what the Supreme Court has referred to as the most fundamental of political rights, the franchise. *See Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("[T]he political franchise of voting . . . is regarded as a fundamental political right, because preservative of all rights"). In those circumstances, and in the absence of clear constitutional authority to the contrary, it is my view that we must give weight to the animating purposes of the Constitution—and in particular its fundamental elevation of democracy and the right to vote—and therefore I conclude that the balance tips in favor of the constitutionality of the proposed legislation.

ERIC H. HOLDER, JR.
*Attorney General*

# Assistance of Counsel in Removal Proceedings (II)

The Attorney General's decision in *Matter of Compean, Bangaly & J-E-C-*, 24 I. & N. Dec. 710 (Att'y Gen. 2009); *Assistance of Counsel in Removal Proceedings (I)*, 33 Op. O.L.C. 1 (2009) (Mukasey, Att'y Gen.), is vacated.

The Acting Director of the Executive Office for Immigration Review shall initiate rulemaking procedures as soon as practicable to evaluate the pre-*Compean* framework for reviewing claims of ineffective assistance of counsel in deportation proceedings and to determine what modifications should be proposed for public consideration.

Pending the issuance of a final rule, the Board of Immigration Appeals and Immigration Judges should apply the pre-*Compean* standards to all pending and future motions to reopen removal proceedings based upon ineffective assistance of counsel.

June 3, 2009

OPINION IN REMOVAL PROCEEDINGS
MATTER OF ENRIQUE SALAS COMPEAN, RESPONDENT
MATTER OF SYLLA BANGALY, RESPONDENT
MATTER OF J-E-C-, ET AL., RESPONDENTS

On January 7, 2009, Attorney General Mukasey overruled in part the decisions of the Board of Immigration Appeals ("Board") in *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988), and *Matter of Assaad*, 23 I. & N. Dec. 553 (BIA 2003), and affirmed the Board's orders denying reopening in *Matter of Compean*, A078 566 977 (BIA May 20, 2008), *Matter of Bangaly*, A078 555 848 (BIA Mar. 7, 2008), and *Matter of J-E-C-* (BIA Apr. 8, 2008). *See Matter of Compean, Bangaly & J-E-C-*, 24 I. & N. Dec. 710 (Att'y Gen. 2009) ("*Compean*"); *Assistance of Counsel in Removal Proceedings (I)*, 33 Op. O.L.C. 1 (2009) (Mukasey, Att'y Gen.).

In *Lozada*, the Board established the procedural requirements for filing a motion to reopen deportation (now removal) proceedings based upon a claim of ineffective assistance of counsel and required the alien to show that he was prejudiced by the action or inaction of his counsel. *Lozada*, 19 I. & N. Dec. at 639–40. The *Compean* decision acknowledged that the *Lozada* framework had "largely stood the test of time," having been expressly reaffirmed by the Board fifteen years after its initial adoption. *Compean*, 24 I. & N. Dec. at 731; *see also Assaad*, 23 I. & N. Dec. at 556–57 (affirming the application of *Lozada* to removal proceedings). Nonetheless, *Compean* both rejected *Lozada*'s constitutional reasoning and

57

ordered the Board not to rely upon the *Lozada* framework, even as a discretionary matter. Instead, *Compean* set forth, as an exercise of the Attorney General's administrative discretion, a new substantive and procedural framework for reviewing all such claims and a formulation of the prejudice showing different from that followed by many courts, despite the limited discussion of the *Lozada* framework in the briefs submitted in *Compean* by the parties and amici curiae. *Compean* further provided that this new administrative framework should apply "henceforth," even though the decision acknowledged it might conflict with the *Lozada*-based approach taken by a number of federal courts of appeals. *See Compean*, 24 I. & N. Dec. at 730 & n.8.

For the reasons stated herein, I have determined that it is appropriate to reconsider the January 7, 2009 decision.

Establishing an appropriate framework for reviewing motions to reopen immigration proceedings based on claims of ineffective assistance of counsel is a matter of great importance. I do not believe that the process used in *Compean* resulted in a thorough consideration of the issues involved, particularly for a decision that implemented a new, complex framework in place of a well-established and longstanding practice that had been reaffirmed by the Board in 2003 after careful consideration. The preferable administrative process for reforming the *Lozada* framework is one that affords all interested parties a full and fair opportunity to participate and ensures that the relevant facts and analysis are collected and evaluated.

Accordingly, I direct the Acting Director of the Executive Office for Immigration Review to initiate rulemaking procedures as soon as practicable to evaluate the *Lozada* framework and to determine what modifications should be proposed for public consideration. After soliciting information and public comment, through publication of a proposed rule in the Federal Register, from all interested persons on a revised framework for reviewing claims of ineffective assistance of counsel in immigration proceedings, the Department of Justice may, if appropriate, proceed with the publication of a final rule.

In *Compean*, the introduction of a new procedural framework depended in part on Attorney General Mukasey's conclusion that there is no constitutional right to effective assistance of counsel in removal proceedings. Because that conclusion is not necessary either to decide these cases

under pre-*Compean* standards or to initiate a rulemaking process, this Order vacates *Compean* in its entirety. To ensure that there is an established framework in place pending the issuance of a final rule, the Board and Immigration Judges should apply the pre-*Compean* standards to all pending and future motions to reopen based upon ineffective assistance of counsel, regardless of when such motions were filed. The litigating positions of the Department of Justice will remain unaffected by this Order. Finally, prior to *Compean*, the Board itself had not resolved whether its discretion to reopen removal proceedings includes the power to consider claims of ineffective assistance of counsel based on conduct of counsel that occurred after a final order of removal had been entered. Given the absence of a pre-*Compean* standard of the Board to apply pending issuance of a final rule, I resolve the question in the interim by concluding that the Board does have this discretion, and I leave it to the Board to determine the scope of such discretion.

Turning to the merits of the particular cases at issue, I find that, for the reasons stated by the Board, its orders denying reopening of the three matters reviewed in *Compean* were appropriate under the *Lozada* framework and standards as established by the Board before *Compean*. On that basis, I concur with Attorney General Mukasey's decision to affirm the Board's decisions denying reopening of these matters. *Compean*, 24 I. & N. Dec. at 743.

ERIC H. HOLDER, JR.
*Attorney General*